William Douglas CARTER, Plaintiff–Appellant,

v.

William T. BURCH; Vernon Beamer, Defendants–Appellees,

and

John R. Isom; Jeffrey Brown, Defendants.

No. 93–2027.

United States Court of Appeals, Fourth Circuit.

Argued May 10, 1994.

Decided Sept. 9, 1994.

**ARGUED:** John Saul Edwards, Roanoke, VA, for appellant. Jack L. Gould, Fairfax, VA, for appellee Burch. John J. Brandt, Slenker, Brandt, Jennings & Johnston, Merrifield, VA, for appellee Beamer.

Before NIEMEYER and WILLIAMS, Circuit Judges, and ERWIN, Senior United States District Judge for the Middle District of North Carolina, sitting by designation.

Affirmed by published opinion. Judge WILLIAMS wrote the opinion, in which Judge NIEMEYER and Senior Judge ERWIN joined.

## OPINION

WILLIAMS, Circuit Judge:

William Douglas Carter (Carter) brought this action pursuant to 42 U.S.C. § 1983 (1988), against Commonwealth's Attorney William T. Burch and police officer Captain Vernon Beamer, for alleged violations of his constitutional rights. Specifically, Carter claims that Burch and Beamer withheld materially exculpatory evidence before and after his criminal trial for the malicious wounding of his ex-wife, and that Burch conspired to present false testimony during the trial. The district court dismissed the § 1983 action pursuant to Fed.R.Civ.P. 12(b)(6) against Burch based on absolute prosecutorial immunity, but denied Beamer's motion for summary judgment, allowing the claim against him to go to trial. After a two-day trial, the jury returned a verdict in favor of Carter, but awarded only $1.00 in nominal damages. The district court denied Carter's motion under Fed.R.Civ.P. 59 for a new trial and declined to amend the judgment.

In this appeal, Carter challenges, *inter alia*, both the district court's determination that Burch was protected by absolute prosecutorial immunity, and the court's refusal either to grant a new trial or to amend the judgment to award additional damages against Beamer. Finding no error, we affirm.

### I.

The factual background of Carter's civil rights claims against Burch and Beamer stem from his criminal conviction for the malicious wounding of his ex-wife. In the early morning hours of July 31, 1987, Carole Vandergrift Carter (Vandergrift) was shot and wounded in her home outside of Middleburg, Virginia, by her own .38 pistol. Vandergrift and Carter had recently finalized a long and acrimonious divorce. Carter was arrested for the crime later that day at his cottage in Saratoga Springs, New York, and was indicted in Virginia on charges of malicious wounding and the use of a firearm during the commission of a felony.

William T. Burch prosecuted the case as Commonwealth's Attorney for Loudoun County, and a four-day jury trial was held in March 1988. At the trial, Vandergrift testified that Carter awoke her in the middle of the night, a struggle ensued, and he shot her in the head behind her right ear. The bullet exited her neck without inflicting serious injury. Carter presented an alibi defense by testifying that he had left Virginia on the evening prior to the shooting, and had travelled to Saratoga, New York. Carter's attorneys also argued that Vandergrift was an emotionally unstable person, and may have attempted to shoot herself, either to commit suicide, or to frame Carter in the shooting. After the jury returned a guilty verdict against Carter on both charges, he was sentenced to fourteen years in prison and was immediately incarcerated in the Loudoun County jail. Carter remained incarcerated until February 14, 1992, when he was released on a writ of habeas corpus, retried for the same crimes, and acquitted. His release was precipitated by the discovery of exculpatory evidence which was not provided to Carter at the time of the first trial. The events surrounding this discovery are the basis for Carter's civil rights claims.

In the fall of 1991, over three years after Carter's conviction, Douglas Poppa, a deputy sheriff of Loudoun County, contacted Carter's defense counsel and informed him of

exculpatory evidence that he had told to both Beamer and Burch before Carter's trial and which had not been revealed to defense counsel. The evidence, to which he testified at the habeas corpus hearing and at Carter's second criminal trial, concerned Vandergrift's emotional state near the time of the shooting. Several months prior to the shooting, Poppa had interviewed with Vandergrift for a position as her bodyguard. He characterized her as high-strung and described a disturbing conversation he had with her during the interview. Vandergrift spoke at length about how much she hated her ex-husband, and at one point in the conversation, Poppa claimed that Vandergrift said, "I hate him so much ... I would shoot myself even if I died if I could make it look like he did it so he would spend the rest of his life in jail, ruin the rest of his life." (J.A. at 129.) Also during the interview, she showed Poppa her .38 revolver, the gun later allegedly used by Carter to wound her.

Several months after his interview with Vandergrift, Poppa testified that he heard of the shooting on the evening news and reported the events of his interview to Appellee Beamer, the head of the Criminal Investigation Division. Poppa claims that Beamer told him that "the case is wrapped up and we got the guy in New York or Canada." (J.A. at 138–39.) Beamer never disclosed, nor directed Poppa to disclose, this evidence to Burch or Carter's defense counsel.

Moreover, Poppa also testified that he told Burch about Vandergrift's statements. Although Poppa contends that his conversation with Burch occurred before Carter's first trial, according to Burch it happened several months after Carter's conviction. Burch admits, however, that when he learned of this evidence, he failed to disclose it to defense counsel. It is also undisputed that this evidence was not presented in Carter's first trial.

In the fall of 1991, several years after Carter was convicted, Poppa testified that he saw a television movie in which a woman framed a police officer for murder. This movie reminded him of the Carter case and caused him to wonder why he had never been called to testify. After discussing the evidence with a state judge Poppa contacted Carter's defense counsel and informed him of the evidence. Based on the nondisclosure of this evidence, Judge Sinclair, of the Thirty–First Judicial Circuit of Virginia, released Carter on a writ of habeas corpus, finding that Carter had proven by a preponderance of the evidence that material evidence of an exculpatory nature had not been revealed to defense counsel. Carter was tried again and acquitted.

Subsequent to his acquittal, Carter filed this lawsuit pursuant to 42 U.S.C. § 1983. He contends that Beamer and Burch violated his constitutional rights by withholding the "Poppa evidence." Carter also alleges that Burch conspired to present false testimony during his first trial. The district court dismissed Burch as a defendant based on absolute prosecutorial immunity, but allowed the case against Deputy Beamer to proceed to trial. After deliberating for approximately seven hours, the jury returned with a note: "We, the jury, cannot agree on whether or not the Poppa evidence is materially exculpatory or exculpable.... Please advise. We are deadlocked on this issue." (J.A. at 453.) The judge gave the jury an *Allen* charge,[1] to which Carter objected. Approximately one-half hour later, the jury returned with a verdict in favor of Carter, and nominal damages totaling $1.00.

Because Carter had shown undisputed evidence of over $2 million in damages for the present value of his lost past and future income due to his incarceration and expenses caused by his conviction, he requested a new trial, or an increase in the award of damages to include, at least, the undisputed compensatory damages he presented at trial.[2] The

1. In *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), the Supreme Court held that it was appropriate for a court to give an instruction to deadlocked jurors, advising them to give deference to each other's views and to listen open-mindedly to each other's arguments in an attempt to reach a unanimous verdict.

2. At the time of the shooting, Carter was the president of his own engineering communications company, and was earning a salary of at least $155,000 to over $300,000 a year.

district court denied this motion, and although it found Carter to be a prevailing party, declined to award attorney's fees pursuant to 42 U.S.C. § 1988 (1988). In appealing this final judgment, Carter challenges: 1) the district court's dismissal of his claim against Burch based on absolute prosecutorial immunity; 2) the district court's denial of his motion for a new trial, or to amend judgment; 3) the district court's decision to give an *Allen* charge to the deadlocked jury; 4) the district court's refusal to admit as evidence Judge Sinclair's letter opinion granting Carter a writ of habeas corpus, and expert testimony interpreting that letter opinion; and 5) the district court's denial of attorney's fees. We consider each issue in turn.

## II.

Carter first alleges that the district court erred when it dismissed his claim against Burch pursuant to Fed.R.Civ.P. 12(b)(6) based on absolute prosecutorial immunity. In reviewing the propriety of a Rule 12(b)(6) dismissal, we consider "whether the complaint, accepting the allegations as true, allows a recovery." *Waterford Citizens' Ass'n v. Reilly,* 970 F.2d 1287, 1290 (4th Cir.1992).

The district court granted Burch absolute prosecutorial immunity as to both of Carter's allegations. Carter contended that Burch withheld materially exculpatory evidence when he failed to turn the "Poppa evidence" over to defense counsel and that Burch conspired to present false testimony during the trial. To support the allegation that Burch conspired to present false testimony, Carter presented an affidavit from Suzanne Culver, a witness at his trial, who was staying with Vandergrift at the time of the shooting. In the affidavit, Culver stated that Burch coached her not to testify that Vandergrift had stated that she was shot with her own gun. Carter claims that this information supported his self-inflicted wound defense theory, because, given the dark of night at the time of the shooting, the only way Vandergrift would have known it was her gun was if she had used it herself.

For important public policy reasons, the Supreme Court held in *Imbler v. Pachtman,* 424 U.S. 409, 430, 96 S.Ct. 984, 995, 47 L.Ed.2d 128 (1976), that absolute prosecutorial immunity is essential for activities "intimately associated with the judicial phase of the criminal process...." Prosecutors must often make decisions that could produce a colorable cause of action for deprivations of constitutional rights, and "[d]efending these decisions, often years after they were made, could impose unique and intolerable burdens upon a prosecutor responsible annually for hundreds of indictments and trials." *Id.* at 425–26, 96 S.Ct. at 993. For example, the veracity of witnesses is often questionable before and after they testify, and a prosecutor must not be influenced by concern about possible personal liability as to whether to use the testimony of such witnesses. *Id.* at 426, 96 S.Ct. at 993. Thus, the Court specifically held that "in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983." *Id.* at 431, 96 S.Ct. at 995.

In so ruling, the Court realized the potential for unfair application of this rule toward a defendant who was genuinely wronged by a dishonest or malicious prosecutor. Directed to this problem, the Court stated:

> [T]he alternative of qualifying a prosecutor's immunity would disserve the broader public interests. It would prevent the vigorous and fearless performance of the prosecutor's duty that is essential to the proper functioning of the criminal justice system. Moreover, it often would prejudice defendants in criminal cases by skewing post-conviction judicial decisions that should be made with the sole purpose of insuring justice.

*Id.* at 427–28, 96 S.Ct. at 993–94. The Court noted that there are other ways to punish prosecutorial misconduct, such as professional disciplinary action and criminal prosecution. *Id.* at 429, 96 S.Ct. at 994. Thus, the Court in *Imbler* found that the importance of protecting the integrity of the prosecutor's office and the judicial system outweighs the desire to afford civil redress to a genuinely wronged defendant.

However, the immunity afforded to prosecutors attaches to the functions they

perform, and not merely to the office. Therefore, when a prosecutor performs duties which are not intimately associated with the judicial process, only qualified immunity is granted. For example, in *Burns v. Reed*, 500 U.S. 478, 492–96, 111 S.Ct. 1934, 1942–45, 114 L.Ed.2d 547 (1991), the Court held that a prosecutor was entitled to absolute immunity for appearing as a lawyer for the State in a probable cause hearing, but should only be granted qualified immunity for giving advice to the police. The Court reasoned that, in a probable cause hearing, the prosecutor appears before a judge and presents evidence to support the issuance of a search warrant, which necessarily implicates the prosecutor's role in the judicial process, thus invoking absolute immunity. *Id.* at 491–92, 111 S.Ct. at 1942. In contrast, giving advice to the police is more connected to the prosecutor's investigatory as opposed to his judicial functions. *Id.* at 493–94, 111 S.Ct. at 1943. The Court noted that it would be incongruous to grant prosecutors absolute immunity for giving advice, but only grant the police qualified immunity for following the advice. *Id.* at 495–96, 111 S.Ct. at 1944. Accordingly, the Court held that prosecutors are only entitled to qualified immunity for their function of advising the police.

In *Buckley v. Fitzsimmons*, —— U.S. ——, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993), the Court further outlined the distinctions between the prosecutor's investigatory and judicial functions. *Buckley* involved allegations that several prosecutors had fabricated evidence during the preliminary investigation of a crime and had made false statements at a press conference announcing the return of an indictment. *Id.* at ——, 113 S.Ct. at 2610. The Court held that neither activity was protected by absolute immunity. The Court reasoned that the fabrication of evidence during the preliminary investigation of a crime was more related to the investigatory function generally performed by a detective or police officer, and thus should not be afforded absolute immunity. "When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is 'neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.'" *Id.* at ——, 113

S.Ct. at 2616 (quoting *Hampton v. Chicago*, 484 F.2d 602, 608 (7th Cir.1973), *cert. denied*, 415 U.S. 917, 94 S.Ct. 1413, 1414, 39 L.Ed.2d 471 (1974)). In addition, the Court noted that the alleged fabrication of evidence occurred before an arrest, and thus before the judicial process had been implicated. *Id.* —— U.S. at ——, 113 S.Ct. at 2616.

In addressing the allegation that the prosecutors made false statements to the press, the Court concluded that those statements were also only protected by qualified immunity. "The conduct of a press conference does not involve the initiation of a prosecution, the presentation of the state's case in court, or actions preparatory for these functions." *Id.* at ——, 113 S.Ct. at 2618. Thus, the Court concluded that neither the fabrication of evidence transpiring before the arrest, nor the false statements to the press, were functions sufficiently connected to the judicial process to justify granting absolute immunity to the prosecutors.

■ We now apply these principles to the allegations before us. Carter's first claim of prosecutorial impropriety involves Burch's alleged withholding of materially exculpatory evidence when he failed to turn the "Poppa evidence" over to defense counsel. There is a conflict in testimony as to when Burch first became aware of the relevant evidence. Poppa testified that he informed Burch of his conversation with Vandergrift before the first trial, while Burch testified that he did not learn of the evidence until several months after Carter's conviction. In either situation, Burch was clearly protected by absolute immunity. If Burch knew of the "Poppa evidence" before Carter's trial, the decision as to whether the evidence was exculpatory and should have been given to defense counsel involved Burch's actions as an advocate of the State. Such a decision was clearly intended by *Imbler* to be the type of prosecutorial function for which absolute immunity should be granted. The Court stated:

> We recognize that the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the

courtroom.... Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence.

424 U.S. at 431 n. 33, 96 S.Ct. at 995 n. 33. The decision whether to turn this evidence over to defense counsel would have occurred after Carter's arrest, but before his conviction, and is clearly part of the presentation of the State's case.

■ Carter, alternatively, argues that if Burch indeed did not learn about the "Poppa evidence" until after Carter's conviction and thereafter withheld the evidence, Burch would not be entitled to absolute immunity because at the time of the violative act, his role in the judicial process would have been concluded. *See Houston v. Partee,* 978 F.2d 362, 367 (7th Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1647, 123 L.Ed.2d 269 (1993). In *Houston,* the court held that prosecutors who withheld materially exculpatory evidence subsequent to the trial and conviction were only entitled to qualified immunity, because they were no longer personally involved in the post-conviction proceedings. *Id.* at 366–67. At the time the prosecutors learned of the evidence, the claimants' direct appeals were pending before the Illinois Appellate Court, but different prosecutors were handling the appeals. The court held that, once the prosecutors were no longer personally involved in the case, their actions did not implicate the judicial process and they were not entitled to absolute immunity. Here, however, the evidence is uncontradicted that, at the time Burch testified that he learned of the "Poppa evidence" and failed to disclose it, he was handling the postconviction motions and the initial direct appeal to the Court of Appeals of Virginia, after which the Attorney General's office took over. In these post-trial motions and preparations for appeal, Burch was still functioning as an advocate for the State, and not in an investigatory capacity.

This case is also very different from *Buckley,* where the misconduct occurred before the initiation of the judicial process. In contrast, here we are faced with a situation where, although the trial had been completed, Burch's functions in representing the State in Carter's post-conviction motions and direct appeal very much implicated the judicial process. Accordingly, we hold that the district court correctly determined that Burch was entitled to absolute prosecutorial immunity for the allegation that he withheld materially exculpatory evidence.

■ Carter also alleged that Burch was involved in a conspiracy to present false testimony, as supported by the affidavit of Suzanne Culver. The Court in *Imbler* specifically held that the presentation of false testimony in court is a charge for which the prosecutor is afforded absolute immunity. *See Imbler,* 424 U.S. at 416, 431, 96 S.Ct. at 988, 995. We therefore hold that the district court correctly granted Burch absolute immunity for this charge as well.

### III.

■ Carter next objects to the jury verdict awarding $1.00 in nominal damages as impermissibly inconsistent with the jury's finding in favor of Carter against Beamer on liability. Because he presented uncontested evidence of special damages resulting from the four years spent in prison, Carter claims that Beamer's liability necessarily resulted in those damages and, therefore, the district court incorrectly denied his motion pursuant to Fed.R.Civ.P. 59 for a new trial or amendment of the judgment to include the uncontested damages. However, "[t]he granting or denying of a new trial, either for excessiveness or inadequateness of the verdict, is discretionary with the trial court and not reviewable absent an abuse of discretion." *Bryant v. Muskin Co.,* 873 F.2d 714, 716 (4th Cir.1989).

We find that the district court's refusal either to grant a new trial, or to amend the verdict to include the damages introduced by Carter, was not an abuse of discretion. In considering Carter's motion, the court explained that a finding of liability against Beamer coupled with an award of nominal damages could be consistently interpreted in two separate ways. First, the jury could have believed Poppa's testimony that he disclosed the materially exculpatory evidence to

Burch prior to the first trial. In such a scenario, Beamer's withholding of evidence would not have been the proximate cause of Carter's damages, since Beamer was only required to turn such evidence over to Burch or the investigators on the case, and Burch was already apprised of the evidence. Alternatively, the jury could have found that, although the "Poppa evidence" was materially exculpatory, the presence of such evidence in the first trial would not have resulted in an acquittal. This result would have been consistent with the testimony of the prosecutor at the second trial, who averred that the presence of the "Poppa evidence" was not the cause of Carter's acquittal.

Because there was evidence that Beamer's actions, while technically violating Carter's constitutional rights, did not proximately cause his injuries, we cannot find the district court's denial of Carter's Rule 59 motion to be an abuse of discretion. Clearly, if a defendant can show that the damages complained of would have occurred even if he did not violate plaintiff's constitutional rights, "an award of damages for injuries ... would constitute a windfall, rather than compensation...." *Carey v. Piphus*, 435 U.S. 247, 260, 98 S.Ct. 1042, 1050, 55 L.Ed.2d 252 (1978). *See also Smith v. City of Chicago*, 913 F.2d 469, 473 (7th Cir.1990) (to recover more than nominal damages for a § 1983 action based on a false arrest, the plaintiff must show that although the defendants fa-

bricated evidence, plaintiff would not have been arrested in the absence of the fabricated evidence), *cert. denied*, 501 U.S. 1217, 111 S.Ct. 2824, 115 L.Ed.2d 994 (1991). Accordingly, we affirm the district court's denial of Carter's Rule 59 motion.

### IV.

■ We now turn to the appropriateness of the district court's *Allen* charge to the jury. The jury returned to tell the judge that they were deadlocked on the meaning of whether the "Poppa evidence" was "materially exculpatory," and the district court gave the jury an *Allen* charge, to which Carter objected and from which he now appeals. A district court's decision to give an *Allen* charge is reviewed for an abuse of discretion. *United States v. Seeright*, 978 F.2d 842, 850 (4th Cir.1992).

Carter argues that the use of the *Allen* charge in this instance was impermissibly coercive, and thus an abuse of discretion. We disagree. This court has approved the use of an *Allen* charge, as long as the instruction is fair, neutral, and balanced. *United States v. Boone*, 759 F.2d 345, 348 (4th Cir.), *cert. denied*, 474 U.S. 861, 106 S.Ct. 176, 88 L.Ed.2d 146 (1985). In *Boone*, 759 F.2d at 348 n. 2, we set out the required elements of an acceptable *Allen* charge, to which the district court's charge in this case sufficiently conformed.[3] The judge's com-

---

3. The district court gave the following *Allen* instruction:

In a large proportion of cases, absolute certainty cannot be expected. Although the verdict must be the verdict of each individual juror and not a mere acquiescence in the conclusion of his or her fellows, yet the jurors should examine the questions submitted with candor and with a proper regard and deference to the opinions of each other.

It is your duty to decide the case, if you can conscientiously do so, and while no juror is expected to yield a conscientious conviction he or she may have as to the weight or effect of the evidence, you should listen with a disposition to be convinced to each other's arguments.

If much the larger number are for the plaintiff, a dissenting juror or jurors should consider whether his or her disagreement is a reasonable one when it differs from the opinion of so many persons equally honest, equally intelligent with him or herself.

If, upon the other hand, the majority is for the defendant, the minority ought to ask themselves whether they may not reasonably question the correctness of a judgment which is not concurred in by the majority, provided, of course, that each juror who finds himself in the majority shall listen and give consideration to the views of the minority.

You are not partisans, you are judges, judges of the facts. Your sole purpose is to ascertain the truth from the evidence before you.

You are the sole and exclusive judges of the credibility of all the witnesses and of the weight and effect of all of the evidence. In the performance of this high duty, you are at liberty to disregard all comments of both Court and counsel, including the remarks I am now making.

Remember at all times that no juror is expected to yield a conscientious conviction he or she may have as to the weight or effect of the evidence. However, those of you who are in disagreement should re-examine your opinions

ments encouraged the jurors to reach a unanimous verdict in a fair and neutral manner. He specifically cautioned that no juror should surrender his or her conscientious belief, but that they should listen to arguments of others with an open mind and a disposition to be convinced. We therefore find no abuse of discretion in the court's use of that charge in this case.

## V.

Carter next claims that the district court erred in excluding the evidence of Judge Sinclair's letter opinion, which ordered his release on a writ of habeas corpus, and expert testimony to interpret that opinion. In the opinion, Judge Sinclair finds that Carter "ha[d] proven by a preponderance of the evidence that material evidence of an exculpatory nature was not revealed to the defense upon request at the trial which resulted in his conviction and present incarceration." (R. at 144.) We review the district judge's decision to exclude this evidence under an abuse of discretion standard. *Martin v. Deiriggi*, 985 F.2d 129, 137 (4th Cir.1992).

■ Carter argues that although it is hearsay evidence under Fed.R.Evid. 801(c), the letter opinion and testimony concerning that opinion was admissible under the hearsay exception for public records and reports. *See* Fed.R.Evid. 803(8)(C). Rule 803(8)(C) allows the admission of hearsay evidence of

> [r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

This court, however, has ruled that this hearsay exception applies to the findings of agencies and offices of the executive branch, but does not apply to the findings of judges. *Nipper v. Snipes*, 7 F.3d 415, 417 (4th Cir. 1993). "A judge in a [criminal] trial is not an investigator, rather a judge." *Id.* Thus, Judge Sinclair's opinion would not be properly admitted under Rule 803(8)(C).

■ Moreover, because the probative value of Judge Sinclair's opinion would be substantially outweighed by the danger of unfair prejudice to Beamer, the district court properly excluded the letter opinion under Fed. R.Evid. 403. "[J]udicial findings of fact 'present a rare case where, by virtue of their having been made by a judge, they would likely be given undue weight by the jury, thus creating a serious danger of unfair prejudice.'" *Nipper*, 7 F.3d at 418 (quoting *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 505 F.Supp. 1125, 1186 (E.D.Pa.1980). In this case, admission of Judge Sinclair's opinion would have been unduly prejudicial to Beamer because the judge's opinion decided the precise issue before the jury in Carter's civil action against Beamer, thereby making it likely that the jury would have placed undue weight on such evidence. We therefore conclude that the district court properly excluded the admission of Judge Sinclair's opinion and any testimony referring to that opinion.

## VI.

■ Finally, Carter argues that the district court erred in denying him an award of attorney's fees under 42 U.S.C. § 1988, which allows the court to award a prevailing party reasonable attorney's fees as part of the cost. We review this denial for an abuse of discretion. *Wadsworth v. Clindon*, 846 F.2d 265, 266 (4th Cir.1988). Here, the district court held that "[t]he degree of success obtained by the plaintiff, or rather the lack of success, persuades the court to exercise the

---

in light of the contrary opinions of your fellow jurors.

The jury's verdict must represent the final judgment of each juror and not a matter of acquiescence in the majority view of which he or she remains conscientiously unconvinced. But remember also that after full deliberation and consideration of all of the evidence, it is your duty to agree upon a verdict if you can do so without violating your individual judgment and your conscience.

Remember, too, that unless your final conscientious appraisal of the evidence in the case clearly requires it, the parties ought not to be exposed to the risk of having to endure a second time the mental and emotional strain of a civil trial, that is, of a retrial.

(J.A. at 454–56.)

discretion, which 42 U.S.C. § 1988 bestows, in favor of awarding no fees." (J.A. at 475.)

The district court was correct in asserting that Carter's award of nominal damages rendered him a prevailing party under § 1988. *Farrar v. Hobby*, —— U.S. ——, ——, 113 S.Ct. 566, 573, 121 L.Ed.2d 494 (1992). In *Farrar*, the Court held that, in some circumstances, a plaintiff who formally prevails under § 1983 should not receive attorney's fees. The Court stated, "[a] plaintiff who seeks compensatory damages but receives no more than nominal damages is often such a prevailing party." *Id.* at ——, 113 S.Ct. at 575. Here, as in *Farrar*, Carter's case involved no broad civil rights issues, and although he sought compensatory damages, he received only nominal damages. Thus, we find that the district court acted within its discretion in refusing to award Carter attorney's fees.

### VII.

For the aforementioned reasons, we find Carter's appeal without merit. Accordingly, the judgment of the district court is affirmed.

*AFFIRMED.*