Affirmed by published opinion. Chief Judge WILKINSON wrote the majority opinion, in which Judges WIDENER, WILKINS, NIEMEYER, LUTTIG, and WILLIAMS joined. Judge MURNAGHAN wrote a dissenting opinion. Judge ERVIN wrote a dissenting opinion, in which Judges MURNAGHAN, HAMILTON, MICHAEL, and DIANA GRIBBON MOTZ joined. Judge HAMILTON wrote a dissenting opinion, in which Judge MURNAGHAN joined.
OPINION
WILKINSON, Chief Judge:
We granted en banc review in this ease to determine whether the district court properly dismissed Lesly Jean’s section 1983 claim against Jacksonville, North Carolina police officers Delma Collins and James Shingleton. The complaint alleged their failure to disclose exculpatory evidence during Jean’s criminal trial for rape and first degree sexual offenses. The district court granted summary judgment in favor of Collins and Shingleton, holding they were entitled to qualified immunity. To the extent Jean claims the officers failed to disclose evidence directly to defense counsel, we hold that the officers are entitled to absolute immunity. To the extent Jean contends Collins and Shingleton failed to turn over evidence to the prosecutor, the officers are protected by qualified immunity. We thus affirm the judgment of the district court.
I.
On July 21, 1982, at approximately 3:00 a.m., a stranger entered the house and bedroom of Alice Kathleen Wilson and forcibly raped her. Soon after the incident was reported to the Jacksonville police, the department announced the suspect’s physical description — black male wearing a blue shirt, blue shorts, and white tennis shoes — to its officers via radio transmission. At approximately 4:40 a.m., Officer James Shingleton spotted a man walking along a local highway who matched the basic description from the radio dispatch. Shingleton activated the blue lights on his patrol car, exited the vehicle, and stopped the person. Shingleton questioned him, instructed him to place his hands on the fender of the car, and told him, he was a suspect in a rape. At that point, the suspect fled into the adjacent woods; the encounter lasted approximately one minute and a half. Later that morning, Shingleton described the person he confronted as black, five feet ten-inches tall, weighing 170 pounds, with close-eut hair and a mustache, and wearing blue shorts, a blue shirt with writing, white knee-high socks, and white tennis high-tops.
Meanwhile, Wilson was transported to the hospital for treatment and then to the police station to make a statement. She described her attacker as a black male, muscular, five feet eight inches tall, weighing about 165 or 170 pounds, with a marine haircut, kinky hair, no facial hair, and wearing dark shorts that were probably navy blue, white crew socks, and high-top sneakers. Wilson also met with a sketch artist to produce a composite of the suspect. A photograph of her composite was distributed to the Jacksonville Police Department. Afterwards, the same sketch artist also met with Shingleton but was unable to develop a reliable composite due to the incomplete nature of the officer’s observations.
The following day, July 22, 1982, Detective Steve Smith, the lead investigator on the case, asked Captain Delma Collins to hypnotize Shingleton in order to garner further details about the person he stopped the morning of the crime. The hypnotic session was recorded on audio tape and its results *704 were noted in a hypnosis information worksheet. Shingleton’s memory of the possible suspect changed in at least three respects: he now believed that the tee shirt design was instead a sweat mark, he remembered that the person in fact did not have a mustache, and he recalled blue stripes on each of the person’s socks. Detective Smith recorded in his notes: “As a result, his description matches the one given by victim.”
On July 26, 1982, Chief of Police Roger Halbert was in a Dunkin Donuts and noticed appellant Jean, a marine stationed at Camp Lejeune in Jacksonville. Halbert believed Jean matched the composite of the suspected rapist. Halbert radioed the police department and asked that Shingleton be sent to the restaurant. When he arrived, Shingleton identified Jean as the man he had seen on the morning of the rape and accordingly arrested him. Detective Smith then interviewed Jean and, after receiving his consent, searched Jean’s locker and laundry bag at the marine base. Smith seized a pair of white high-top tennis shoes, dark blue athletic shorts with white stripes, and a blue tee shirt. Jean was fingerprinted, photographed, and then released.
The following day, July 27, 1982, Smith asked Wilson to come to the police station to view a photo lineup that included Jean’s photo. After viewing the lineup, Wilson was unable to make a positive identification. The next day, Wilson called Smith at the police station requesting to look at the photos again because one of them had made her feel sick. After observing the photos a second time, Wilson picked out Jean’s photo as the one that made her sick and stated that another of the photos looked “haunty.” Again, however, she could not make a positive identification.
On July 30, 1982, upon the recommendation of Detective Smith, Captain Collins hypnotized Wilson in an effort to determine whether she could remember anything more about the photo that made her feel sick. Wilson’s prehypnotie memories were recorded on a prehypnosis information worksheet, the session was recorded on audio tape, and new information was noted on another worksheet. At least three new pieces of information emerged during the session: Wilson believed her attacker had an accent, possibly Puerto Rican, and she recalled white shoelaces and a Nike emblem in connection with the attacker’s shoes. Collins and Smith deemed the session to be unproductive due to the paucity of new details.
In the following two months, Wilson was asked to listen to voice identification recordings and view a live lineup. On August 4, 1982, after listening to several voice exemplars numerous times, Wilson stated that Jean’s voice sounded like the one from her bedroom. Although Smith initially assumed she did not make a positive identification that day, Wilson later called him and explained that her statement was intended as a positive identification. She then confirmed again that Jean’s voice exemplar was the voice of the man who had raped her. On September 17, 1982, Wilson was asked to view a live lineup consisting of three persons, including Jean. Wilson identified Jean as the person who had raped her and the police placed him under arrest.
Jean was indicted in October 1982 for rape and first degree sexual offenses. Despite timely discovery requests, the prosecutor did not disclose the fact that witnesses had been hypnotized until Wilson’s testimony at trial. The prosecutor also did not disclose the recordings of the hypnotic sessions, despite general pretrial discovery requests and a more specific request for such recordings by defense attorneys at trial. The jury, however, was made aware of Wilson and Shingle-ton’s hypnoses, as defense counsel cross-examined both witnesses on that point.
On December 5, 1982, Jean was convicted on all counts and sentenced to two consecutive life terms. After his direct appeals and applications for state postconvietion relief proved unsuccessful, Jean filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of North Carolina. In Jean v. Rice, 945 F.2d 82 (4th Cir.1991) (per curiam), we reversed that court’s denial of his petition, holding that the government’s failure to disclose the audio recordings and the accompanying reports of the hypnotic sessions was a violation of the principles announced in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Accordingly, we vacated *705 Jean’s conviction. The state declined to retry Jean, and he was released from prison.
On May 20, 1994, Jean filed the present complaint against Collins and Shingleton in the United States District Court for the Eastern District of North Carolina, alleging Fourth Amendment and Fourteenth Amendment Due Process Clause violations under 42 U.S.C. § 1983 and supplementary state-law claims. The district court dismissed Jean’s state causes of action, holding that one failed to state a claim and that the others were barred by the applicable statute of limitations. In a later order, the district court granted summary judgment in favor of Collins and Shingleton on Jean’s section 1983 claims, holding the police officers were protected by qualified immunity. Jean appealed the district court’s summary judgment order only with respect to his due process claim. A panel of this court reversed the decision of the district court. Jean v. Collins, 107 F.3d 1111 (4th Cir.1997). Thereafter, a majority of the judges in active service voted to rehear this appeal en bane.
II.
Initially we note that Jean’s due process claim, alleging suppression of exculpatory evidence, does not clearly state the precise theory upon which it is premised. See Burns v. Reed, 500 U.S. 478, 487, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991) (in cases implicating official immunity “it is important to determine the precise claim that petitioner has made”). At times, Jean contends his constitutional rights were violated as a result of Collins and Shingleton’s failure to turn over evidence to the District Attorney’s Office. At other times, however, Jean asserts that the officers generally suppressed the relevant evidence. See Compl. ¶ 41. (referring to “the actions of defendants in withholding exculpatory evidence”). Both Collins and Shingleton clearly understood Jean’s complaint to allege their failure to disclose evidence directly to Jean’s defense counsel. See Collins Aff. ¶ 20 (“At no time did I intentionally withhold this evidence from Mr. Jean’s defense counsel.”); Shingleton Aff. ¶ 21 (“At no time in my career as a police officer have I been trained that I am responsible for deciding what evidence will be presented at trial or disclosed to a criminal defense counsel in response to legal discovery requests.”). To the extent Jean asserts a duty on the part of Collins and Shingleton to turn over exculpatory evidence to the defense, that claim must fail. Police officers are absolutely immune from suits challenging a failure to disclose evidence directly to the defense.[1]
The doctrine of absolute immunity under section 1983 rests on the assumption that Congress did not intend to abolish certain well-established immunities recognized by courts at the time of section 1983’s enactment. Buckley v. Fitzsimmons, 509 U.S. 259, 268, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993). To evaluate government officials’ specific claims for absolute immunity, the Supreme Court has adopted a functional approach — inquiring whether the particular official performs functions similar to those protected by common-law immunities when Congress enacted section 1983. Id. at 268-69, 113 S.Ct. 2606; Burns, 500 U.S. at 484, 486, 111 S.Ct. 1934; Imbler v. Pachtman, 424 U.S. 409, 430, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). The Court recently reaffirmed this functional approach in Kalina v. Fletcher, — U.S. -,-, 118 S.Ct. 502, 510, 139 L.Ed.2d 471 (1997), holding that a prosecutor personally attesting to the truth of facts necessary for a probable cause determination was not absolutely immune from suit because she functioned not in a prosecu-torial role, but as a witness. The Court reiterated that “in determining immunity, we examine ‘the nature of the function performed, not the identity of the actor who performed it.’” Id. at 508, 118 S.Ct. 502 (quoting Forrester v. White, 484 U.S. 219, 229, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988)); *706 see Buckley, 509 U.S. at 269, 113 S.Ct. 2606; Motley v. Briggs, 475 U.S. 335, 342, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); Carter v. Burch, 34 F.3d 257, 261-62 (4th Cir.1994); see also Ireland v. Tunis, 113 F.3d 1435, 1443 (6th Cir.), cert. denied, — U.S.-, 118 S.Ct. 560, 139 L.Ed.2d 401 (1997); Hill v. City of New York, 45 F.3d 653, 660 (2d Cir.1995).
In Fletcher the Court explained that, to protect the independent judgment of prosecutors, an official is absolutely immune from suit when “performing functions that require the exercise of prosecutorial discretion.” — U.S. at -, 118 S.Ct. at 507. The decision whether to disclose exculpatory evidence to an adversary is a central part of the prosecutor’s trial preparation, is undertaken in the role of advocate for the State, and plainly requires the exercise of prosecu-torial discretion. Imbler itself involved the prosecution’s alleged suppression of material evidence at trial. 424 U.S. at 413-16, 96 S.Ct. 984. And subsequent decisions have left no doubt that prosecutors enjoy absolute immunity from claims alleging a failure to disclose exculpatory evidence. For example, the Court in Fletcher described Imbler as providing an absolute immunity defense to the prosecutor from Imbler’s “charge that exculpatory evidence had been suppressed.” Fletcher, — U.S. at -, 118 S.Ct. at 506. And in Burns, the Court explained that its Imbler decision, pursuant to the functional approach, held the prosecutor absolutely immune from suit for the “deliberate suppression of exculpatory evidence.” Burns, 500 U.S. at 486, 111 S.Ct. 1934. The Court has also stated that actions for which a prosecutor is accorded absolute immunity “must include the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made.” Buckley, 509 U.S. at 273, 113 S.Ct. 2606; see Ireland, 113 F.3d at 1445.
We have likewise read Imbler to require absolute immunity from section 1983 claims alleging suppression of exculpatory evidence. In Carter, we held that “the decision as to whether the evidence was exculpatory and should have been given to defense counsel ... was clearly intended by Imbler to be the type of prosecutorial function for which absolute immunity should be granted.” 34 F.3d at 262; see also Lyles v. Sparks, 79 F.3d 372, 377 (4th Cir.1996) (“The Supreme Court also held in Imbler that absolute immunity protected the prosecutor from allegations that he had knowingly used perjured testimony and suppressed material evidence at the plaintiffs trial”). We explained in Carter that the decision whether to disclose evidence to the defense “is clearly part of the presentation of the State’s case” and represented conduct undertaken as an advocate for the State. 34 F.3d at 262-63. Other circuits have reached the same conclusion. See Moore v. Valder, 65 F.3d 189, 194 (D.C.Cir.1995), cert. denied, — U.S. -, 117 S.Ct. 75, 136 L.Ed.2d 35 (1996); Reid v. New Hampshire, 56 F.3d 332, 336 (1st Cir.1995) (“under Imbler it is now [a] well-settled rule that a prosecutor cannot be held personally hable for the knowing suppression of exculpatory information” (internal quotation marks and citation omitted)); Hill, 45 F.3d at 661-62; Myers v. Morris, 810 F.2d 1437, 1446 (8th Cir.1987).
To the extent, therefore, that Jean contends that Collins and Shingleton failed to disclose exculpatory evidence directly to the defense, the police officers are entitled to the same absolute immunity that would be available to prosecutors for execution of the identical function. Jean’s claim casts the officers in a role much different from their traditional investigatory one. Police officers normally assemble available evidence for the prosecution rather than evaluate it for trial purposes. Buckley, 509 U.S. at 273, 113 S.Ct. 2606. Prosecutors assess the material and exculpatory nature of that evidence in determining whether disclosure to the defense is required. By asserting that the police have a duty to make such sensitive legal determinations, Jean raises a claim against the officers not in their investigatory role, but instead in an advocate’s role “intimately associated with the judicial phase of the criminal process.” Imbler, 424 U.S. at 430, 96 S.Ct. 984. Under the Court’s approach, the officers must be accorded absolute immunity.
*707 The fact that the defendants in the present suit are police officers, rather than prosecutors, is irrelevant to the immunity analysis. Because the immunity is tied to the nature of the function performed and not to the identity of the defendant performing that function, e.g., Fletcher, — U.S. at-, 118 S.Ct. at 508, we look to the conduct challenged by Jean’s suit rather than the defendants’ titular position. The Court has specifically recognized that “[wjhen the functions of prosecutors and detectives are the same, as they were here, the immunity that protects them is also the same.” Buckley, 509 U.S. at 276, 113 S.Ct. 2606; see also Hill, 45 F.3d at 660 (extending absolute immunity to non-attorney employees of district attorney's office under functional approach); Davis v. Grusemeyer, 996 F.2d 617, 631 (3d Cir.1993) (extending absolute immunity to employee working for attorney “when the employee’s function is closely allied to the judicial process”). It would be incongruous to hold prosecutors absolutely immune from suits concerning disclosure decisions made in the course of their traditional advocate’s role while granting police officers only qualified immunity with respect to the same decisions, which fall outside their normal investigatory role.
We note finally that the same considerations underlying absolute immunity for prosecutors also support granting police officers absolute immunity from suits alleging failure to disclose exculpatory evidence to the defense. The Court in Imbler first relied upon the common-law concern that “harassment by unfounded litigation would cause a deflection of the prosecutor’s energies from his public duties.” 424 U.S. at 423, 96 S.Ct. 984. The Court noted that “[s]ueh suits could be expected with some frequency, for a defendant often will transform his resentment at being prosecuted into the ascription of improper and malicious actions to the State’s advocate.” Id. at 425, 96 S.Ct. 984. The same consideration countenances absolute immunity for the police officers in the present action. Because police uncover most evidence in criminal investigations, suits alleging suppression of exculpatory evidence could be leveled against them in almost every ease. Imbler’s observation that “a prosecutor inevitably makes many decisions that could engender colorable claims of constitutional deprivation,” id., would be no less true of police officers forced to make the difficult determinations surrounding the State’s disclosure obligations. Without absolute immunity from section 1983 claims like Jean's, the police would be forced to defend against vexatious litigation and their “energy and attention would be diverted from the pressing duty of enforcing the criminal law.” Id.
The Court in Imbler also relied upon the common-law concern that the fear of civil liability would create “the possibility that [a prosecutor] would shade his decisions instead of exercising the independence of judgment required by his public trust.” Id. at 423, 96 S.Ct. 984. It is unlikely that police officers, who lack prosecutors’ legal training, would be more able to confidently reach independent legal conclusions regarding the State’s disclosure obligations without fear of civil liability. In fact, officers fearing personal liability would likely turn over much more evidence than necessary, thereby transforming the combination of section 1983 and Brady obligations into more absolute rights to discovery for criminal defendants. This would fundamentally change our adversarial system and harm the judicial process. “The Brady rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur.” United States v. Bagley, 473 U.S. 667, 675, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Granting police officers absolute immunity from suits alleging a failure to disclose accords with the considerations traditionally cited in favor of absolute prosecutorial immunity — preservation of government officials’ independent judgment, Imbler 424 U.S. at 423, 96 S.Ct. 984, and the more general protection of the judicial process. Bums, 500 U.S. at 485, 111 S.Ct. 1934.
Finally, we note that an adequate remedy for police officers’ failure to disclose exculpatory evidence already exists in the criminal law. Whenever the State withholds material exculpatory evidence from the defense, the Constitution requires that any conviction gained thereby be vacated. Bagley, 473 U.S. *708 at 678, 105 S.Ct. 3375; Giglio v. United States, 405 U.S. 150, 155, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); Brady, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215. The adequacy of judicial remedies for prosecutorial misjudgments “‘tend[s] to reduce the need for private damages actions as a means of controlling unconstitutional conduct.’ ” Burns, 500 U.S. at 492, 111 S.Ct. 1934 (quoting Butz v. Economou, 438 U.S. 478, 512, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978)); Imbler, 424 U.S. at 427, 96 S.Ct. 984; Springmen v. Williams, 122 F.3d 211, 214 (4th Cir.1997).
In sum, we find that absolute immunity for police officers performing prosecutorial functions is mandated by well-settled doctrine of the Supreme Court. We decline to make police officers into mini-prosecutors and to impose upon them obligations that would cut actual prosecutors out of the loop. From any claim that Collins and Shingleton failed to disclose exculpatory evidence directly to the defense, the officers are absolutely immune from suit.
III.
Jean next asserts that the'officers had a constitutional duty under Brady to turn over evidence to the prosecution relating to Wilson’s and Shingleton’s hypnoses. Regardless of whether Jean’s claim presently states a constitutional violation, we conclude that Shingleton and Collins are entitled to qualified immunity. In 1982, a reasonable police officer would not have known that his failure to turn over such evidence violated a criminal defendant’s clearly established constitutional rights.
A.
The basic purposes of qualified immunity are well known. The immunity is designed to shield government officials performing their duties from the burdens of trial and the threat of monetary liability. Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). “Without such an immunity, the operations of government would be immobilized.” Torchinsky v. Siwinski, 942 F.2d 257, 260 (4th Cir.1991). Government officials would not perform their discretionary duties vigorously but would act timidly to avoid the risk of being haled into federal court. Anderson v. Creighton, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); Harlow, 457 U.S. at 814, 102 S.Ct. 2727. Society also would bear substantial costs including “the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office.” Harlow, 457 U.S. at 814, 102 S.Ct. 2727; see also Anderson, 483 U.S. at 638, 107 S.Ct. 3034; Tarantino v. Baker, 825 F.2d 772, 774 (4th Cir.1987). To limit these costs, qualified immunity protects “all but the plainly incompetent or those who knowingly violate the law.” Malley, 475 U.S. at 341, 106 S.Ct. 1092. Thus, government officials forfeit this defense only where a reasonable official would have known that an action violated clearly established constitutional rights. Harlow, 457 U.S. at 818, 102 S.Ct. 2727; Winfield v. Bass, 106 F.3d 525, 530 (4th Cir.1997) (en banc).
The requirement that a right be clearly established ensures that officials have ample notice of the legal standards that govern their conduct. See Davis v. Scherer, 468 U.S. 183, 195, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). Consistent with this need for notice, a court must identify the right infringed at a high level of particularity. Anderson, 483 U.S. at 639, 107 S.Ct. 3034; Winfield, 106 F.3d at 531. To define the right too abstractly would convert the defense of qualified immunity “into a rule of virtually unqualified liability.” Anderson, 483 U.S. at 639, 107 S.Ct. 3034; see also DiMeglio v. Haines, 45 F.3d 790, 803-04 (4th Cir.1995). Of course Anderson does not require that a prior case have held identical conduct to be unlawful. Id. at 640, 107 S.Ct. 3034. But officers cannot be ambushed by newly invented theories of liability or by unforeseen applications of old ones. Thus, “the ‘contours of the right’ must have been so conclusively drawn as to leave no doubt that the challenged action was unconstitutional.” Swanson v. Powers, 937 F.2d 965, 969 (4th Cir.1991) (quoting Anderson, 483 U.S. at 640, 107 S.Ct. 3034); see also Lassiter v. Alabama A & M Univ., 28 F.3d 1146, 1150 (11th Cir.1994) (en banc) (“For qualified immunity to be surrendered, preexisting law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclu *709 sion for every like-situated, reasonable government agent that what[the] defendant is doing violates federal law in the circumstances .”).
In order for notice to officials to be effective, the source of that notice must be identified'. It is clear that a court cannot confine its assessment of an immunity defense to Supreme Court decisions alone. See United States v. Lanier, 520 U.S. 259, 117 S.Ct. 1219, 1226, 137 L.Ed.2d 432 (1997). It is equally clear that a court cannot restrict its inquiry to eases identified by the parties. Elder v. Holloway, 510 U.S. 510, 515, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994). But government officials must have some guideposts about the sources of law that can clearly establish a particular right. Our nation’s courts produce a vast number of decisions that could conceivably influence officials’ discharge of their duties. See Swanson, 937 F.2d at 968. Officials cannot be expected to master the entire corpus of this caselaw in addition to fulfilling their public responsibilities. See Davis, 468 U.S. at 196 & n. 13, 104 S.Ct. 3012. The very immensity of American jurisprudence creates the distinct likelihood that jurisdictions will offer conflicting opinions over how government officials should carry out their tasks. See Swanson, 937 F.2d at 968. To hold officials responsible for sorting out these conflicts, without any guidance about what jurisprudence to follow, could generate widespread confusion over the scope of official obligations. An unbounded legal universe would give rise to guessing games over whether this or that decision in this or that jurisdiction created a clearly established right. Such a limitless universe would also give judges broad latitude to second-guess the actions of officers on the spot.
Ordinarily, therefore, courts in this circuit need not look beyond the decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose to determine whether a right was clearly established at a particular time. Wilson v. Layne, 141 F.3d 111, 114 (4th Cir.1998) (en banc); Wallace v. King, 626 F.2d 1157, 1161 (4th Cir.1980). This presumption, like the Eleventh Circuit’s longstanding practice, provides necessary guidance to government officials about whether a contemplated course of conduct may subject them to personal liability. See Jenkins by Hall v. Talladega Bd. of Educ., 115 F.3d 821, 826 n. 4 (11th Cir.) (en banc), cert. denied, — U.S. -, 118 S.Ct. 412, 139 L.Ed.2d 315 (1997); Hamilton By and Through Hamilton v. Cannon, 80 F.3d 1525, 1531 n. 7 (11th Cir.1996); Courson v. McMillian, 939 F.2d 1479, 1497-98 (11th Cir.1991). Thus, if a right is recognized in some other circuit, but not in this one, an official will ordinarily retain the immunity defense. Of course, the converse also holds true. If a right is clearly established in this circuit but not in another circuit, that conflict will not shield the official from liability. The approach we adopt will place parameters upon the immunity inquiry—if immunity is to stem litigation, as the Supreme Court intended, the issue of whether a right is clearly established should not send public officials on an Odyssean quest.
B.
In this case, we must analyze the state of the law in 1982 to determine whether Collins and Shingleton violated a clearly established constitutional right. Anderson requires that the right be defined at a high level of particularity. But even at the highest level of generality, the right which Jean asserts was not clearly established in 1982. Jean has failed to demonstrate that, at that time, police had a duty grounded in federal law to turn over the evidence at issue to a prosecutor.
Several of the cases on which Jean relies do not even discuss whether police officers had any constitutional duty to provide evidence to a prosecutor. As of 1982, the Supreme Court had not held that police had such a constitutional duty; Brady and its progeny instead involved prosecutors’ failures to disclose evidence to the defense. E.g., United States v. Agurs, 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); Giglio, 405 U.S. at 154, 92 S.Ct. 763; Brady, 373 U.S. at 87-88, 83 S.Ct. 1194. With respect to this circuit’s decisions, many of those advanced by Jean involved nondisclosure by prosecutors or are otherwise totally inappo-site. E.g., Norris v. Slayton, 540 F.2d 1241, 1244 (4th Cir.1976) (prosecutor’s failure to disclose police officer’s report held Brady *710 violation); Clarke v. Montgomery Ward & Co., 298 F.2d 346, 348 (4th Cir.1962) (private common law action for malicious prosecution brought under diversity jurisdiction). These cases simply lack the requisite factual similarity to the instant case. Police officers in 1982 could not have been expected to survey decisions involving prosecutors’ failures to disclose evidence to the defense and conclude that, by analogy, they bore an independent constitutional duty to provide evidence to prosecutors. Thus, this line of authorities cannot demonstrate that Shingleton and Collins violated Jean’s clearly established constitutional rights.
Jean asserts that this circuit’s opinion in Barbee v. Warden, Md. Penitentiary, 331 F.2d 842 (4th Cir.1964), imposed a constitutional duty on police officers to give evidence to a prosecutor. In Barbee, the prosecutor failed to disclose certain police reports to the defense. Id. at 844. These reports contained the results of ballistics and fingerprint tests that cast doubt on Barbee’s involvement in a shooting. Id. Although the prosecutor was unaware of the reports, this court held that his ignorance did not excuse his failure to disclose them to the defense and reversed a district court order denying Barbee post-conviction relief. Id. at 846.
We believe that Jean misapprehends the essential holding of Barbee. Barbee did not require police, as a constitutional matter, to furnish evidence to a prosecutor. Instead, as this circuit later explained, Barbee held simply that the police’s knowledge of such evidence would be imputed to the prosecutor in deciding whether the prosecutor had fulfilled his Brady duties. United States v. Sutton, 542 F.2d 1239, 1241 n. 2 (4th Cir.1976); see also Boone v. Paderick, 541 F.2d 447, 450-51 (4th Cir.1976). By imputing the police’s knowledge of exculpatory evidence to the prosecutor, Sutton and Barbee simply encouraged prosecutors’ offices to establish “procedures and regulations ... to insure communication of all relevant information on each case.” Giglio, 405 U.S. at 154, 92 S.Ct. 763. Thus, while prosecutors are not relieved of their Brady duties for failing to disclose material evidence known only to the police, police officers who in 1982 failed to give such evidence to prosecutors did not themselves violate a-clearly established constitutional right.[2]
In sum, police officers in 1982 could reasonably have expected to be internally accountable to prosecutors for not turning over evidence in their possession. -A failure to turn over exculpatory evidence might jeopardize a conviction under Brady. A failure to turn over inculpatory evidence might undermine the State’s case. But the officers had no earthly idea that they would be subject to a federal cause of action for money damages when no relevant decision had held that the police’s responsibility to furnish evidence to the prosecution was governed by federal constitutional law.[3]
• In this case, it is undisputed that the prosecutor, Assistant District Attorney Walter Vatcher, knew that the witnesses had been hypnotized and knew the details of the various identification procedures employed by the police during their investigation. Furthermore, Collins and Shingleton maintain that they also discussed with Vatcher the existence of the reports and recordings of the hypnoses, a claim Vatcher denies. Fif *711 teen years after trial, the parties are still disputing the value of the hypnosis-related evidence, whether Vatcher was derelict in failing to ask for further details of it, and whether Shingleton and Collins were derelict in not providing it. In fact, however, the Supreme Court in Giglio had charged the prosecution with the duty to request and evaluate relevant evidence in the State’s possession. Giglio, 405 U.S. at 154, 92 S.Ct. 763. Vatcher never contends in his affidavits that he asked for any materials related to the hypnoses, as might be expected of a prosecutor’s office after Giglio. Furthermore, Vatcher admitted that “[o]fficers Shin-gleton and Collins turned over all evidence that I requested from them.” His apparent decision not to request additional details of the hypnoses cannot now be recast as a constitutional failure by the police officers to disclose such evidence.
Even if there were some general constitutional obligation in 1982 to hand over evidence to a prosecutor, the precise nature of that duty was anything but clear. Nothing in the applicable easelaw suggested that the failure to turn over evidence relating to witnesses’ hypnoses violated clearly established constitutional rights. As of 1982, no decision of either the Supreme Court or this circuit had held that police committed a constitutional violation by not handing over evidence of this sort. Of course, we do not require a case with facts identical to the instant one. Anderson, 483 U.S. at 640, 107 S.Ct. 3034. But here no relevant case remotely resembled the situation confronted by Shingleton and Collins. Under these circumstances, we cannot hold them liable for a constitutional infraction.
Jean finally relies on several cases from other circuits, but such cases ordinarily do not demonstrate that a constitutional right was clearly established in this circuit. Most of these decisions do not even pertain to a police officer’s failure to hand over evidence of witnesses’ hypnoses to a prosecutor. Two cases did involve the disclosure of hypnosis-related evidence. One comes from the Second Circuit. United States v. Miller, 411 F.2d 825 (2d Cir.1969). That decision does not even speak to the constitutional strictures on police conduct. Miller involved only a prosecutor’s failure to disclose evidence of a hypnosis to the defense. Id. at 832. Thus, it cannot demonstrate that Shingleton and Collins violated Jean’s clearly established constitutional rights.
The other case comes from the Northern District of Georgia. Emmett v. Ricketts, 397 F.Supp. 1025 (N.D.Ga.1975). Like Miller, Emmett is not binding authority in this circuit. Further, district court decisions such as Emmett cannot clearly establish a constitutional right because “while they bind the parties by virtue of the doctrine of res judicata, they are not authoritative as precedent and therefore do not establish the duties of nonparties.” Anderson v. Romero, 72 F.3d 518, 525 (7th Cir.1995); see also D'Aguanno v. Gallagher, 50 F.3d 877, 880 n. 5 (11th Cir.1995). In addition to lacking precedential force, district court opinions from other jurisdictions function as especially poor sources of law to demonstrate that a right was clearly established. Police officers in Jacksonville, North Carolina can hardly be expected to keep abreast of legal developments in the Northern District of Georgia to determine the scope of their constitutional obligations.
C.
A word about the dissenting opinions. The three dissenting opinions together illustrate why the qualified immunity defense had to be adopted in the first place. The dissents would impose novel theories of civil liability on officers in the absence of notice—precisely the danger against which the defense of qualified immunity was designed to guard. See Davis, 468 U.S. at 195, 104 S.Ct. 3012. The dissents somehow seize on vague proscriptions of “unfair” police conduct as determinative guideposts by which Collins and Shingleton should have measured their conduct. See post at 712 (Murnaghan, J., dissenting) (explaining that police’s duty is “to protect every one of us from injustice” and that the officers’ actions “were manifestly unfair”). The' dissents also introduce post-1982 easelaw as support for a rule of law that officers should have anticipated in 1982. See post at 715 (Ervin, J., dissenting) (citing 1989 ease); post at 718 (Hamilton, J., dissenting) (citing 1989, 1992, and 1996 cases). Further *712 more, the dissents point to decisions outside this circuit as beacons of light that should have been recognized from afar by the North Carolina police officers in this case. See post at 713 (Murnaghan, J., dissenting) (citing decisions from the D.C. Circuit' and the Northern District of Georgia).
In sum, the dissents would fail to provide even the rudiments of notice to those whose conduct they now rush to condemn. One even goes so far as to say that “[i]t is irrelevant whether the officers would have been on notice in 1982 that a panel of this court had held other officers liable for a Brady violation under § 1983” because “the underlying constitutional or statutory right upon which the § 1983 action is premised” can provide the needed guidance. See post at 715-716 (Ervin, J., dissenting). Yet it is precisely the bare-boned vagueness of constitutional phraseology that cannot guide the qualified immunity analysis. Anderson in fact emphasized as much in rejecting “the right to due process of law” as a helpful guide. See 483 U.S. at 639, 107 S.Ct. 3034 (“[I]f the test of ‘clearly established law1 were to be applied at this level of generality, it would bear no relationship to the‘objective legal reasonableness’ that is the touchstone of Harlow.”). The hope for professional police work lies in the guidance provided by clearly communicated rules, not in the unbounded approaches adopted by the various dissenting opinions.
This case involves an attempted end run around the absolute immunity protecting the prosecutor — a prosecutor who knew not only of the hypnosis of witnesses but also of the various identification procedures the officers employed. Blocked from pursuing a civil damages remedy against a prosecutor who admitted receiving all the evidence he requested from the investigating police officers, Jean now tries to shift the blame to the officers themselves. Although this circuit now recognizes that police too may be subject to Brady duties, it had not yet recognized such duties in 1982. And it would be wrong to allow the thwarting fact of prosecu-torial immunity to force this case into an altogether different mold — one where the police officers are subject to constitutional duties that in fact materialized only after Jean’s prosecution.
In conclusion, the relevant sources of law do not clearly establish that in 1982 police themselves labored under federal constitutional duties with respect to the disclosure of evidence to the prosecution or that such duties, if any, included a responsibility to disclose evidence relating to witnesses’ hypnoses. In holding that these officers are entitled to qualified immunity, we do not diminish the seriousness of Jean’s incarceration. But this court already has granted his petition for a writ of habeas corpus. Jean v. Rice, 945 F.2d 82. To go further, however, and impose money damages against Shingle-ton and Collins would blindside these defendants and make them into scapegoats with the aid of many years of hindsight. It would also violate the cardinal principle of qualified immunity — that officials may not later be subject to monetary liability when their behavior at the time did not violate any clearly established constitutional right.
IV.
For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED.

. In his dissenting opinion, Judge Ervin claims we are precluded from considering the absolute immunity of Collins and Shingleton because it was not pled or addressed in prior proceedings. The officers did plead the defense of qualified immunity, however, and we may properly consider the closely related question of the scope of the immunity to which they are entitled. See Allen v. Zurich Ins. Co., 667 F.2d 1162, 1168 n. 5 (4th Cir.1982). Failure to do so here would create the possibility that qualified immunity would incorrectly be accepted as the limit of protection for police officers "performing functions that require the exercise of prosecutorial discretion.” Kalina v. Fletcher, - U.S. -, , 118 S.Ct. 502, 507, 139 L.Ed.2d 471 (1997).

. In their dissenting opinions, Judge Ervin and Judge Hamilton dispute our reading of Barbee. Our reading, however, is supported both by the Supreme Court's decision in Giglio, 405 U.S. at 154, 92 S.Ct. 763, and this circuit's decisions in Sutton, 542 F.2d at 1241 n. 2, and Boone, 541 F.2d at 450-51. Each of these decisions predates the relevant conduct of Collins and Shin-gleton. In contrast, the dissents' view of Barbee rests on implications from caselaw that postdates the relevant conduct in this case.

. More recently this circuit has recognized that the failure of police officers to turn over evidence to a prosecutor may violate a criminal defendant's constitutional right to receive such evidence. See Taylor v. Waters, 81 F.3d 429, 436 n. 5 (4th Cir.1996); Carter, 34 F.3d at 264; Goodwin v. Metis, 885 F.2d 157, 162-63 (4th Cir.1989), overruled in part by Albright v. Oliver, 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). Contrary to Judge Hamilton's claim that the majority fails to explain what it means by proper notice, the decisions in Taylor, Carter, and Goodwin now provide notice to police officers that they can be subject to monetary damages under section 1983 for failure to disclose exculpatory evidence to the prosecutor. These decisions, however, all postdate the events in this case and thus we do not adopt the dissent's theory that proper notice to defendants can be notice after the fact.